## AMHERST EATON *versus* FRANCIS O. J. SMITH *et al.*

When a new word is used in a contract, or when a word is used in a technical or peculiar sense, as applicable to any branch of business, or to any particular class of people, evidence of usage is admissible to explain and illustrate it, and that evidence is to be considered by the jury ; and the province of the court then is, to instruct the jury what will be the legal effect of the contract, as they shall find the meaning of the word, modified or explained by the usage.

But when a word having an established place in the language, is used apparently in no new, technical or peculiar sense, it is the province of the court to put a construction upon the written contract, according to the established use of language, as applied to the subject matter and modified by the whole instrument or by existing circumstances.

The defendants gave the plaintiff a bond, dated in June 1835, stipulating that they would convey to him one eighth part of a tract of timber land in Maine, which he had agreed to purchase, but allowing him the right of electing to rescind his bargain, he giving notice of such election before January 1, 1836, unless a majority of the owners of the tract should sooner " determine to *operate* on said land next winter," in which case his right of election and giving notice was limited to fifteen days after notice by the defendants of such determination of the owners. It was *held*, that in the absence of evidence *aliunde* to affect the ordinary meaning of the terms *operate on the land*, it was the province of the court, and not of the jury, to put a construction upon them, and that taking the contract by itself, these terms included the selling of *stumpage*, (that is, selling off the timber growing, to be cut by the purchaser,) as well as the cutting of the timber by the owner at his own expense.

A notice was given by the defendants to the plaintiff in the beginning of September 1835, that the proprietors of such tract " have concluded to commence arrangements for operating upon said tract next winter, by the first of October next, prior to which time we wish you to inform us whether you elect to retain your interest in said tract or not." It was *held*, that this was a sufficient notice of the determination of the proprietors to operate the then ensuing winter, and that the plaintiff was bound to give notice of his election by the first of October.

THIS was an action of debt on a bond to the plaintiff, dated June 27, 1835, executed by the defendants, Francis O. J. Smith and Samuel Ward, in the penal sum of 30,000 dollars. The condition was, that whereas the plaintiff had that day paid to Smith the sum of $4140, and had given his three promissory notes to Smith for $4140 each, payab e in one, two, and three years, with interest annually, and in consideration thereof and on the payment of the notes after maturity Smith had agreed to convey to the plaintiff one eighth part of a tract of land, called the Taunton and Raynham grant, in the county of Somerset, in Maine, warranting he eighth to contain 1380 acres, exclusive of reserves for

public uses ; and it was further agreed between the parties, that if the plaintiff should desire to rescind and give up the bargain for the purchase of the land, and should give notice thereof at any time on or before the first day of January 1836, (unless a majority of the owners of the land should sooner " determine to *operate on said land* next winter," in which case his right of election to purchase or not, should be limited to fifteen days after notice thereof should be given to the plaintiff by Smith or Ward,) upon such notice by the plaintiff, Smith should refund and repay to the plaintiff, within three months thereafter, the sum of $4140, with interest thereon, and return the three promissory notes, and thereupon the bargain as to the purchase should be annulled ; now, if upon notice from the plaintiff to Smith before the 1st of January 1836, (or earlier if the owners agreed to operate, as before provided,) of his desire to rescind the bargain, Smith should repay the sum of $4140, and give up the three notes, or if on payment by the plaintiff of the three notes Smith should give the plaintiff a good warranty deed of one eighth of the land, and the same should prove to be at least 1380 acres, and the title thereto good, then the obligation was to be void, otherwise in full force.

The declaration alleges a notice to the defendants, on November 3, 1835, of the plaintiff's election to rescind his contract, and a failure on the part of the defendants to repay the money and return the notes.

At the trial, before *Wilde* J , the plaintiff proved that he gave notice to Ward, on the 28th of October 1835, and to Smith, on the 3d of November, of his election to rescind the bargain.

The defendants produced in evidence the plaintiff's answer to a bill of discovery filed by the defendants, in which he admitted the receipt, on or soon after September 3, 1835, of a letter from the defendants, dated September 2d, in which they say : " Pursuant to the bond, &c., we inform you that the proprietors have concluded to commence arrangements for operating upon said tract next winter, by the first of October next, prior to which time we wish you to inform us whether you elect to retain your interest in said tract, or have us

refund your advance money and resume your interest, according to the terms of said bond. The earliest information you can give us upon the subject will be most acceptable." And in answer to one of the interrogatories, Eaton stated that before Ward went to Maine to ascertain if any contract could be made for operating on the land, and, according to the respondent's belief, some time in September 1835, he declared to Ward, that he had determined to rescind the contract for the purchase of the land, and that he would have nothing further to do therewith.

The defendants then proposed to introduce evidence to show that the word *operate*, as applied to eastern timber lands, was understood in Maine to include selling *stumpage*, that is, selling off the timber growing, to be cut and removed by the purchaser, as well as the cutting and transporting of timber by the owner of the land at his own expense. To the introduction of this evidence the plaintiff objected, as being inadmissible in itself, and particularly against the plaintiff, as he lived in Boston and the contract was made there. But the evidence was admitted.

The defendants then called several witnesses to prove that a majority of the owners of the land in question had determined to operate thereon within the then next winter. It was testified by Haven and Sibley, two of the owners, that in the summer of 1835 the owners of five eighths of the land held conversations respecting it, in all of which they all expressed their first wish to be to sell the land ; but that if that could not be done, rather than let the land lie unproductive, they would sell the stumpage ; and if that should be found impracticable, they thought it best to put on teams on the owner's account ; that next to selling the land, they thought it best to sell stumpage, because that would involve little expense, and perhaps not any ; that Ward went to Portland twice, once in the latter part of August, and once in the latter part of October, 1835, to ascertain whether stumpage could be sold, and if it could not, to inquire on what terms he could obtain teams ; that Ward had authority to sell stumpage, subject to Smith's approval ; that there was no change in the views of the owners, except that before June 27, 1835, they

had more hope of selling the land, but before October the chance of selling the tract had gone by for that season ; that after Ward went to Portland in August, he came back in a few days, and told the Boston owners that Smith agreed with them in opinion ; that this was early in September, and no agreement had then been made to operate on the owners' account, and that for that purpose, arrangements should be made in August or September.

The plaintiff then called several witnesses, who testified that *operating* did not mean selling stumpage, but was a term used in contradistinction to it.

The evidence on this point being contradictory, the judge ruled it out, on both sides, on the ground that such a usage must be uniform, to avail either party.

The plaintiff called Russell Eaton, his son, who testified that he received a letter from Ward, dated Portland, September 2, 1835, (which was produced,) authorizing the witness to find a purchaser of the land and stating the terms on which it would be sold, but likewise stating, that if it was not bargained for in September the owners would make arrangements the very first of the next month to operate it.

The judge instructed the jury, that if a majority of the owners of the land had determined to operate, at the time of giving the notice to the plaintiff, though that determination were made subject to the contingency of a previous sale of the land, it would bind the plaintiff; that the jury were not to regard the evidence in relation to the meaning of the word *operate*, but were to take it in its common meaning ; that it included selling stumpage, as well as cutting timber at the owners' expense ; that the testimony of Haven and Sibley showed that they had agreed to sell stumpage if Smith agreed with them, and that Smith's signing the letter of September 2d to the plaintiff, was evidence of his agreement, unless contradicted by Ward's letter of the same date to Russell Eaton, and that this was a sufficient determination within the meaning of the bond.

The jury returned a verdict for the defendants, and the plaintiff moved for a new trial. If any of the rulings and

instructions were wrong, a new trial was to be granted ; other wise judgment was to be entered on the verdict.

*F. Dexter* and *Peabody*, for the plaintiff, objected to the instruction to the jury, that the word *operate*, as matter of law, embraced the selling of stumpage. It is used in the bond to signify cutting the timber at the expense of the owners of the land. An agreement of the owners to sell stumpage, was not such an agreement as required the plaintiff to make his elec - tion, whether he would rescind or affirm his bargain, and to give notice of such election, before the end of the year. The relation of the parties would be no more varied by a sale of the timber, than by a sale of the land ; in either case the proprietors would not be subjected to great expense or incon venience ; but the cutting of timber by the proprietors would necessarily be attended with much expense and risk of loss, and therefore upon their determination to adopt that mode of managing the land, a speedy election by the plaintiff, and early notice of it, would be important to them. Had the term *operate* been used, either in its plain ordinary meaning, or in a technical legal sense, it would have been proper for the court to construe the contract ; but as it was a word in common language, susceptible of two meanings, it should have been left to the jury to determine by the aid of the extrinsic circumstances, which sense was intended by the parties. 3 Stark. Ev. 1033, 1035.

The jury were also instructed, that notice of a determina tion of the owners, existing at the time when the bond was given to the plaintiff, to sell stumpage in the winter, in case they should not be able previously to sell the land, bound the plaintiff to make his election. This was erroneous. The whole contract contemplates a material *change* in the views of the proprietors. At the time of the notice to the plaintiff, there was no reason for hastening his election, which did not exist at the date of the bond. If an agreement to sell stumpage would satisfy the meaning of the bond, it must at least be an unconditional agreement to sell stumpage.

*Choate* and *Crowninshield*, for the defendants.

SHAW C. J. delivered the opinion of the Court. It was necessary for the defendants, in order to show that the condition of their bond was not broken, to prove two things · —

1. That they determined to operate on the land, within the meaning of the agreement, the winter next ensuing ; and

2. That they gave notice thereof to the plaintiff within the time that they had a right so to do by the agreement.

By the aid of a bill of discovery, the letter of September 2, 1835, addressed by the defendants to the plaintiff, was produced, and it seems to be a sufficiently explicit notice of the determination of the proprietors to operate the then ensuing winter. The phrase is, " have concluded to commence arrangements for operating upon said tract next winter, by the 1st of October next, prior to which time we wish you to inform us, whether you elect to retain," &c.

Had the plaintiff's election to rescind the contract been made before the 1st of October, the time thus limited in this notice, but more than fifteen days after the notice given, the case might have presented another question, namely, whether the defendants had not enlarged the time stated in the bond, by the form of their notice. But as the plaintiff did not make any election till after the 1st of October, this question does not arise.

The remaining question was, whether the proprietors had then determined to operate the following winter.

There was evidence tending to show, that they had come to a conclusion to do something with the land, to turn it to profit, and therefore if they could not sell the land itself, it was their determination to sell off the growing timber, in parcels or lots, as they could meet with purchasers.

This mode of managing timber lands is called selling the *stumpage.*

The question was, whether this was a determination to operate on the land, within the meaning of the agreement.

The defendants offered evidence, which was objected to by the plaintiff, to show that by usage this word " *operate,*" was used in Maine and in reference to Maine lands, in a peculiar sense, and included selling stumpage. This evidence was admitted, and subsequently some evidence was given on the other side tending to a contrary conclusion. But the evidence being contradictory, the whole was ultimately set aside, and the jury were directed to disregard it.

The question must then be determined by the effect and legal operation of the words of the contract, as they stand in the agreement of the parties.

The evidence of the determination of the proprietors to make arrangements was left to the jury, and they found a verdict for the defendants.

The plaintiff now moves the Court to set aside the verdict, and grant a new trial, on two grounds, viz.

First, because it ought to have been left to the jury to determine what the parties intended by the term *operating* upon the land ; and

Secondly, because, if it was competent to the court to instruct the jury on this point, the direction in this respect was wrong.

On the first point, the Court are of opinion, that when a new and unusual word is used in a contract, or when a word is used in a technical or peculiar sense, as applicable to any trade or branch of business, or to any particular class of people, it is proper to receive evidence of usage, to explain and illustrate it, and that evidence is to be considered by the jury ; and the province of the court will then be, to instruct the jury what will be the legal effect of the contract or instrument, as they shall find the meaning of the word, modified or explained by the usage. But when no new word is used, or when an old word, having an established place in the language, is not apparently used in any new, technical or peculiar sense, it is the province of the court to put a construction upon the written contracts and agreements of parties, according to the established use of language, as applied to the subject matter, and modified by the whole instrument, or by existing circumstances. This was the course adopted on the present trial. The defendants offered evidence of usage which was resisted by the plaintiff, and although at first received, was ultimately rejected, as the plaintiff desired that it might be. Had the verdict been the other way, and had the defendants excepted, it would have presented a different question. But the plaintiff objected to the admission of evidence *aliunde*, evidence of peculiar usage, and the objection was sustained. There being then no evidence of usage or other evidence *aliunde*, to affect

the ordinary meaning of the contract and agreement of the parties, the Court are of opinion that it was the duty and province of the court to put a construction upon this contract, and that there was nothing to leave to the jury, in regard to the meaning and effect of the written agreement. On the other part of the case, the court instructed the jury that they were not to regard the evidence as to the meaning of the word " operate," but were to take it in its common and established meaning, and that it did include selling the growing timber, as well as cutting and sending it to market at the owner's expense. This is the direction alleged to be wrong, and the plaintiff contends that in its true meaning and acceptation, it intended only, cutting timber or clearing the land, or performing other labor or making other improvements thereon at the owner's expense. This question is not without difficulty, especially to be decided as the plaintiff contends that it must be, not in reference to any local usage of Maine, but as it must have been understood by the plaintiff residing here in Massachusetts, and according to its known use, as a part of the English language. On the whole, and in view of all the circumstances, the Court are of opinion that the direction was right.

The object of the purchase of these lands, among all parties, was profit. There were two modes of making profit. The one, to sell the land at an advance ; the other, to use it in some mode which would be productive, without parting with the land itself. This might be done by employing men and teams to go on and cut timber and get it out, on money wages, or at some share or lay, or by making roads, landing-places and other preparations for clearing and settlement, or in various other modes. To sell the growing timber to individuals or companies would require the employment of surveyors, and agents to lay it out in lots, either lots of land or lots of trees, and generally to superintend the operation.

There is another view that somewhat strengthens this conclusion to be drawn from the agreement itself. In construing a written instrument, every part of it is to be considered with a view to ascertain the object and scope of it, and thus get at the intent of the parties, which is the governing rule of con-

struction.   Here there was a provision for giving a deed and making the contract of sale absolute some time after the contract was made.   In case of selling stumpage, the condition of the lands would be altered and they might be greatly deteriorated in value ; and yet there is nothing in the agreement, that looks either to charging the plaintiff, Eaton, with any portion of the expense, or accounting to him for any part of the proceeds of the sales of timber, before his right of election to rescind the contract should cease, and the contract of sale become absolute.   Hence we are led to conclude, that it was understood and intended, that if any mode of managing or dealing with the lands, should be adopted by the proprietors, by which profits should be drawn from the sale of its timber, and the value of the freehold diminished, and the state of the land for all purposes of sale essentially altered, then the plaintiff, on notice, should make his election in a short period, before any such change should be actually made.   As this mode of dealing with timber lands was one of the known and accustomed modes of using them and turning them to profit, and one likely to be resorted to, as no provision was made for it, unless under the term *operating* upon it, we are led to conclude, that that mode was included under that broad generic term, and that it was intended to embrace every method of dealing with the land, and turning it or its products to profit, other than that of a sale of the freehold.

It is said in behalf of the plaintiff, that this construction greatly abridged his term of election.   Be it so.   The shorter term was as much a matter of contract as the longer, and the true question is, whether the contingency happened, on which it depended.   The term of election to hold or rescind such a contract, in the fluctuating times, when this contract was made, was undoubtedly a great advantage to the plaintiff ; it gave him the option of holding the land if it should rise, and of rejecting it if it should fall, and that without any consideration, except the use of the money advanced.   But by the same contract, the election was given to the defendants to shorten and abridge that period by an act of their own, by coming to a determination to operate upon the land, whatever was intended by that term, in however small a degree, and giving the plain-

.iff notice of it. The simple question is, what the parties understood and intended by this provision. On the whole, the Court are of opinion, that they intended any mode of improving the land to the purposes of profit, other than a direct sale, and that surveying, laying it out in lots, and selling growing timber, was such a mode of converting it to profitable use and was a mode of *operating* according to their understanding, that the direction in this respect was right, and that judgment must be rendered on the verdict for the defendants.